

AGREEMENT
BETWEEN
ROYAL CARIBBEAN CRUISES LTD.
AND
NORWEGIAN SEAFARERS' UNION
FOR
MARINE OFFICERS
AND
DECK & ENGINE RATINGS
AND
RIDING CREW
AND
HOTEL PERSONNEL
SERVING ON CRUISE VESSELS
UNDER THE
ROYAL CARIBBEAN INTERNATIONAL
BRAND

Effective January 1, 2006

EXHIBIT 3



### Article 1 - Application

a) This Collective Bargaining Agreement ("the Agreement") between Royal Caribbean Cruises Ltd. (herein after called "the Owners/Company") and the Norwegian Seafarers' Union (herein after called "the Union") sets out the standard terms and conditions applicable to all Marine Officers and Deck and Engine Ratings, Riding Crew and Hotel Personnel (hereinafter called "Seafarers") employed on board vessels operated by the Royal Caribbean International brand.

b) This Agreement is applicable and of full force and effect whether or not the Owners/Company have entered into individual contracts of employment ("the Employment Agreement") with any Seafarer.

c) The Seafarers who are covered by the Agreement, the Union, and the Owners/Company shall refrain from strikes, work slow downs, lockouts and similar action at seas and in ports during the length of this contract.

d) The Owners/Company is obligated to employ the Seafarers on the terms and conditions of this Agreement, and to enter into individual Employment Agreements with each Seafarer which incorporates or refers to the terms and conditions of this Agreement.

e) A Seafarer to whom this Agreement is applicable, in accordance with Article 1.a. above, shall be covered by the Agreement with effect from the date on which the Seafarer signs on or the date from which this Agreement is effective as applicable, whether the Seafarer has signed the Ship's Articles or not, until the date on which the Seafarer signs off and/or the date until which, in accordance with this Agreement, the Owners/Company is liable for the payment of wages, whether or not the Employment Agreement is executed between the Seafarer and the Owners/Company and whether or not the Ship's Articles are endorsed or amended to include the terms of this Agreement.

### Article 2 – Employment Commencement Expenses

a) Expenses in connection with commencement of service on board shall be paid by the Owners/Company, except with respect to travel expenses for Hotel personnel in Group C.

b) Traveling expenses paid by the Owners/Company shall not include the Seafarer's baggage in excess of the normal weight allowed by the air carrier. Any such excess baggage shall be paid for by the Seafarer. The travelling expenses consist of airfare, train fare, bus fare, reasonable taxi fare, hotel expenses, and food expenses via gateway cities and itineraries in accordance with the Owners/Company's Travel Policy and listed in the Human Resources Office on board.

2

c) The Seafarer is required to maintain and renew his or her medical certificate at the Seafarer's expense. Before signing on a ship for a new service period, the Seafarer will ensure that his or her medical certificate is valid for at least the length of the expected service period. The Seafarers shall obtain physicals as requested by the Owners/Company at medical facilities designated by the Owners/Company.

d) Seafarers are required to maintain their licenses/certificates in order and up to date as well as to pay for any renewal or yearly dues on same.

e) Seafarers shall pay the cost for the United States C1/D Visa. The Owners/Company shall pay the cost of any itinerary driven visas.

**Article 3 – Duration of Employment**

a) The Seafarer shall sign an Employment Agreement for a specific period ("the Service Period") not to exceed ten (10) months. The length of the Service Period is to be decided by the Owners/Company. The Service Period is an expectation of length of employment, not a contractual right, since the Owners/Company may terminate the Employment Agreement prior to the expiration of the Service Period without cause or notice, ref. Article 4.b. The Employment Agreement shall be automatically terminated in accordance with the terms of this Agreement at the first arrival of the Ship in port after the maximum ten (10) months' Service Period.

b) **New Hires:** The first ninety (90) days of service shall be considered a Probationary Period, which entitles the Owners/Company or its representative, i.e. the Master of the vessel, to terminate the Employment Agreement with or without cause effective immediately. In such cases, the Seafarer shall only be entitled to pay through the date of termination. The Probationary Period shall not apply to Seafarers previously engaged by the Owners/Company within one (1) year prior to being rehired.

c) **Promotions:** The first ninety (90) days of service after a promotion shall also be considered a Probationary Period, which entitles the Owners/Company or its representative, i.e. the Master of the vessel, to reduce the rank of the Seafarer to the Seafarer's previous position or to terminate the Employment Agreement with or without cause.

e) During the probation period, the Seafarer may terminate the Employment Agreement by giving seven (7) days notice. If the Employment Agreement is terminated by the Seafarer, the Seafarer must pay the Owners/Company all expenses associated with the Seafarer's repatriation.

3

d) If the Employment Agreement is terminated by the Owners/Company within the probationary period, the repatriation costs must be paid by the Owners/Company.

**Article 4 – Termination of Employment**

a) The Seafarer shall be entitled to terminate the Employment Agreement:

(i) If the termination is as a result of the expiration of an agreed Service Period, Ref. Article 3;

(ii) during the Probationary Period without cause or notice; but if the Seafarer fails to provide seven (7) days notice, the Seafarer will not be eligible for re-hire;

(iii) by giving seven (7) days' written notice;

(iv) if the vessel is due to sail into a warlike operations area as defined by Lloyd's;

(v) if the Ship is certified substandard in relation to the applicable provisions of the Safety of Life at Sea Convention (SOLAS) 1974, the International Convention on Loadlines (LL) 1966, the Standards of Training, Certification and Watchkeeping Convention (STCW) 1978 as amended in 1995 and later, the International Convention for the Prevention of Pollution from Ships 1973, as modified by the Protocol of 1978 (MARPOL) or substandard in relation to ILO Convention No. 147, 1976, Minimum Standards in Merchant Ships, as supplemented by the Protocol of 1996, and remains so for a period of thirty (30) consecutive days provided that adequate living conditions and provisions are provided onboard or ashore.

(vi) If the Seafarer terminates the Employment Agreement before the expiration of the service period, the Seafarer shall pay for the necessary travel expenses.

b) The Owners/Company shall be entitled to terminate the Employment Agreement without reason:

(i) **Marine Officer:** By giving seven (7) days' advance written notice of termination or seven (7) days' Monthly Total Pay in lieu of notice.

**Deck and Engine Ratings & Riding Crew:** By giving seven (7) days' advance written notice of termination or seven (7) days' Monthly Total Pay in lieu of notice.

4

**Hotel Personnel:** By giving seven (7) day's advance written notice of termination or seven (7) days Monthly Total Guaranteed Pay in lieu of notice;

(ii) In the event that neither seven (7) days' advance notice nor seven (7) days' payment in lieu of notice has been given, then the Seafarer shall be entitled to:

**Marine Officers:** Payment of two (2) month's Monthly Total Pay within two (2) months of the termination date.

**Deck and Engine Ratings & Riding Crew:** Payment of two (2) months Monthly Total Pay within two (2) months of the termination date.

**Hotel Personnel:** Payment of two (2) months Monthly Total Guaranteed Pay.

c) The Owners/Company shall be entitled to terminate the Employment Agreement of any Seafarer immediately (without notice) and shall be obligated to pay the Seafarer only through the date of termination, if the termination is a result of any of the following:

(i) If the termination is as a result of the expiration of the expected Service Period;

(ii) the termination is taking place during the Probationary Period;

(iii) the termination is as a result of notice given by the Seafarer, ref. Article 4.

(iv) the Seafarer is lawfully and properly dismissed as a consequence of the Seafarer's own misconduct, such as but not limited to, violating the Drug and Alcohol Policy (Annex 3) or the Policy Prohibiting Harassment, the Policy Prohibiting Inappropriate Guest Interaction or the Zero Tolerance Policy on Crime (Annex 6).

d) Termination when misconduct is alleged:

(i) Upon the misconduct of a Seafarer giving rise to a lawful entitlement to dismiss, the Owners/Company shall, prior to dismissal hold a hearing before a Committee consisting of at least three members with the Master as Chairman and the Chief Engineer, Staff Captain and/or General Manager/Hotel Director as the other members. In addition to the above members there should be another member appointed by the Seafarer from among the remaining crew.

(ii) In special cases, the Committee may be appointed by the Owners/Company and the hearing held ashore if considered necessarily in order to best evaluate the factual basis for the dismissal.

(iii) The Master shall question the Seafarer and any witnesses who might be able to provide information in the case. The remaining members of the committee and the Seafarer may ask questions either through the Master or directly with the Master's consent. If the Master makes a decision in the matter, he/she shall state the ground for it, and the decision shall be entered into the log book or the special protocol.

(iv) The Crew Purser/HR Manager should, if possible, act as the Secretary to the Committee.

(v) A decision on dismissal shall be made as soon as possible and, at the latest, within fourteen (14) days after the circumstances of the case became known to the Master, unless special conditions necessitate a longer time limit. The Seafarer shall, if possible, be informed of the decision immediately.

(vi) In the event that the above procedures has not been adhered to, the Seafarer shall be entitled to payment as stated in Article 4.b (ii).

(vii) In the event that a Seafarer is dismissed because of misconduct, the Seafarer shall not be eligible for rehire.

e) For the purposes of this Agreement refusal by any Seafarer to obey an order to sail the Ship shall not amount to misconduct of the Seafarer where:

(i) the Ship is certified unseaworthy for otherwise substandard as defined in Article 4;

(ii) for any reason it would be unlawful for the Ship to sail;

(iii) the Seafarer refuses to sail into a warlike operations area.

**Article 5 – Pay, Working Hours, Social Program Compensation & Retirement Plan**

a) Pay, generally:

(i) The Seafarers covered by this Agreement are divided into four pay groups, 1: Marine Officers, 2: Deck and Engine Ratings, 3: Riding Crew, and 4: Hotel Personnel.

5

6

(ii) The wages of each Seafarer shall be calculated in accordance with this Agreement and the attached Wage Scales, Annex 1: (Marine Officers) and Annex 2: (Deck and Engine Ratings), Annex 3: (Riding Crew), and Annex 4: (Hotel Personnel).

(iii) The Owners/Company may pay net wages by Direct Deposit. The Seafarers shall receive their wages in two payments -- one payment made on the 15th of the month and the second made on or before the last day of the month -- with the amount paid each pay period being equal to one half of the Seafarer's guaranteed monthly wages minus lawful deductions. Any extra overtime compensation earned during a pay period shall be paid no later than the payday that falls on or before the 15th of the following month.

(iv) The only deductions from such wages shall be proper statutory deductions required by applicable national laws or regulations, deductions recorded in this Agreement and its attachments; deductions and allotments authorized by the Seafarer and bank fees associated with net pay Direct Deposits or Seafarer pay. The Owners/Company and the Union recognize the bank fees associated with net pay Direct Deposit and bank transfers as lawful deductions for the Seafarer's pay.

(v) For the purpose of calculating wages for a partial month, every month shall be regarded as having thirty (30) days and every day shall be regarded as one-thirtieth (1/30) of a month.

(vi) Pay accrues from and including the day of sign on and up to and including the day of sign off. For purposes of calculating wages for a partial month, all Seafarers on Sign-on and Sign-off days shall be guaranteed a minimum of eight (8) hours pay even if the actual amount of hours worked is less then the eight (8) hours. For purposes of calculating wages for a partial month, at sign-off, sick days are not counted as hours worked.

b) Work Rules, generally:

(i) Any break, as approved by the Seafarers supervisor, during the work period of less than fifteen (15) minutes shall be counted as working time.

(ii) Overtime work will be performed at the direction of the Master or the Master's representative.

(iii) Overtime shall be recorded on a daily basis and signed by a designated supervisor at least once per week. A copy of the signed overtime record shall be given to the Seafarer, if requested by the Seafarer. The Owners/Company might use an electronic recording system.

7

(iv) The following days shall be considered Public Holidays at sea or in port: New Years Day (January 1), Maundy Thursday (Easter), Good Friday (Easter), Easter Sunday, Labour Day (May 1), Philippine Independence Day (June 12), Christmas Eve (December 24), Christmas Day (December 25) and New Year's Eve (December 31).

(v) Seafarers shall perform all necessary service to maintain the safety of the ship, its crew, passengers and cargo and the lives of others aboard other vessels, including participating in the training for the use of fire equipment, other safety equipment, the use and manning of life boats and life rafts as determined solely by the Master. Such safety duties and training shall not count as working hours and for overtime payment if performed outside the individual Seafarers normal working hours.

e) Working Hours and Pay of Marine Officers with totally Consolidated Wages:

(i) The Pay is stated in Annex 1.

(ii) The Marine Officers with totally consolidated wages are the Master, Staff Captain, Chief Engineer, Chief Engineer Jr., and Chief Electrical Engineer. The seafarers in this group are salaried. Monthly Total Pay, stated in the Wage Scale (Annex 1) is compensation for all hoursworked, including irregular working hours, work on Saturdays, Sundays and on Public Holidays.

d) Working Hours and Pay of Marine Officers with partially Consolidated Wages:

(i) The Pay is stated in Annex 1.

(ii) Monthly Total Pay for Marine Officers with partially consolidated wages consists of Monthly Basic Pay, Monthly Guaranteed Overtime Pay, and extra hourly overtime.

(iii) The Monthly Basic Pay is for a forty-four (44) hour work week, and compensation for work between forty-four (44) and fifty-six (56) hours per week. The Monthly Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays.

(iv) The Monthly Guaranteed Overtime Pay is overtime compensation covering the Guaranteed Overtime Hours.

(v) The Hourly Overtime Rate is for overtime hours worked each month above the number of guaranteed overtime hours.

8

(vi) Overtime work will be performed at the direction of the Master or the Master's representative. Any overtime hours in addition to the Guaranteed Overtime will be compensated at the Hourly Overtime Rate stated in the Seafarer's Wage Scale.

e) Working Hours and Pay of Deck and Engine Ratings and Riding Crew:

(i) The Pay for the Deck and Engine Ratings is stated in Annex 2. The pay for Riding Crew is stated in Annex 3.

(ii) Monthly Total Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Extra Hourly Overtime.

(iii) Monthly Guaranteed Basic Pay is for a forty-four (44) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays and Sundays. Monthly Guaranteed Initial Overtime Pay is for work between forty-four (44) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of monthly guaranteed pay is in return for 303.10 hours of work per month.

(iv) The Extra Overtime Rate Per Hour is for work performed in addition to the sixty-point-six-two (60.62) Guaranteed Overtime Hours per month. The Extra Overtime Rate Per Hour is for work performed in additional to the 303.10 hours of work per month. The Extra Overtime Rate Per Hour is stated in the Wage Scale.

(v) Work on Public Holidays shall be covered by overtime compensation. The Monthly Supplemental Overtime Pay of sixty-point-sixty-two (60.62) hours per month may be used to cover Work on Public Holidays.

(vi) Ratings are required to perform alternating service on deck and in the engine department when such duties and services are necessary to the trade and the vessel concerned. Compensation for such alternating service is included in the Monthly Guaranteed Pay.

f. Working Hours and Pay of Hotel Personnel:

(i) The Pay for Hotel Personnel is stated in Annex 4.

(ii) The Hotel Personnel are divided into four sub-groups – Groups A, Group B, Group C, and Group D.

9

(iii) For Group A, the Monthly Total Guaranteed Pay is pay for all hours worked, including irregular working hours, work on Saturdays, Sundays and on Public Holidays. Seafarers in this group are salaried and not entitled to overtime pay.

(iv) For Group B, the Monthly Total Guaranteed Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Extra Hourly Overtime.

a. Monthly Guaranteed Basic Pay is for a forty (40) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays. Monthly Guaranteed Initial Overtime Pay is for work between forty (40) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of the Monthly Guaranteed Pay is in return for 303.10 hours of work per month.

b. The Extra Overtime Rate Per Hour is for work performed in additional to the 303.10 hours of work per month. The Extra Overtime Rate Per Hour is stated in the Seafarers' Wage Scale.

(v) For Group C, the Monthly Total Guaranteed Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, Extra Hourly Overtime, and Vacation Pay.

a. Monthly Guaranteed Basic Pay is for a forty (40) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays. Monthly Guaranteed Initial Overtime Pay is for work between forty (40) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of the Monthly Guaranteed Pay is in return for 303.10 hours of work per month.

b. The Extra Overtime Rate Per Hour is for work performed in addition to the 303.10 hours of work per month. The Extra Overtime Rate Per Hour is stated in the Seafarers' Wage Scale.

c. The Monthly Total Guaranteed Pay received by Seafarers in this Group shall be made up of Gratuities provided by passengers and pay from the Owners/Company. Out of the Monthly Total Guaranteed Pay, USD fifty (50) dollars shall be paid by the Owners/Company.

10

The remaining Total Monthly Guaranteed Pay (including the Vacation Pay) shall be made up of Gratuities. Group C Seafarers shall receive the Gratuities from the passengers. The Owners/Company shall be obligated to advise the passengers that Gratuities are suggested for Cabin Service, Dining Room Service, and Bar Service. Seafarers who receive gratuities from passengers should share a portion of the gratuities with the Seafarers who assist them. The Owners/Company may provide gratuity-sharing guidelines and assist the process of gratuity sharing.

d. If, in any month, the total income earned by a Seafarer in this Group is below the Seafarer's Monthly Total Guaranteed Pay, upon notification and accounting, the Seafarer shall be paid a supplement equal to the difference between the Monthly Total Guaranteed Pay amount and the Gratuities and the USD fifty (50) dollars amounts received by the Seafarer from the Owners/Company.

(vi) For Group D, the Monthly Total Guaranteed Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Extra Hourly Overtime. Monthly Guaranteed Basic Pay is for a forty (40) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays. Monthly Guaranteed Initial Overtime Pay is for work between forty (40) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of the Monthly Guaranteed Pay is in return for 303.10 hours of work per month. The Extra Overtime Rate Per Hour is for work performed in addition to the 303.10 hours of work per month. The Extra Overtime Rate is stated in the Seafarer's Wage Scale.

g) Onboard Luggage Delivery

The Owners/Company may pay Seafarers a flat fee (instead of the Extra Overtime Rate Per Hour) for the time and effort required to deliver passenger luggage.

h) Social Program Compensation

For Marine Deck and Engine Ratings and Riding Crew, the Social Program Compensation included in the Wage Scale (Annex 2 and 3), shall be paid directly to the Seafarer. It is the understanding between the parties to this Agreement that the Social Program Compensation is meant to be used by the Seafarer to purchase medical insurance covering the Seafarer when on vacation, medical insurance for the Seafarer's family and to enable the Seafarer to participate in a pension fund scheme in the Seafarers country of residence.

11

i) Retirement Plan

The Owners/Company has a Shipboard Retirement Plan available for shipboard employees. The plan is not available to Seafarers for whom the Owners/Company contributes to other retirement programs on behalf of the Seafarer. The rights and benefits of Seafarers and beneficiaries are determined by the terms and conditions of the formal Plan. The Owners/Company reserved the right to amend and/or terminate the plan without notice at any time. The Owners/Company agrees to inform its Seafarers and the Union of any such changes and/or termination. The complete Plan is available for all Seafarers to review at the Crew Relation Purser's desk.

j) Allotments

The Owners/Company and the Union recognize that the Owners/Company must adhere to the Philippine Overseas Employment Agency (POEA) rules and Regulations regarding allotments for Filipino Seafarers. The Owners/Company and the Union recognize the POEA Allotments as lawful deductions.

k) Bank Transfers

The Owners/Company may give assistance to Seafarers wishing to transfer money to their families and/or bank accounts. The Owners/Company may give this assistance by paying net wages by Direct Deposit. The Owners/Company and the Union recognize the bank fees associated with net pay Direct Deposits and bank transfers as lawful deductions from the Seafarer's pay.

Article 6.- Repatriation

a) Repatriation shall take place in such manner that it meets all reasonable requirements. The Owners/Company shall be liable for the cost of maintaining the Seafarer ashore until repatriation takes place. A Seafarer shall be entitled to repatriation at the Owners/Company's expense to the gateway city:

(i) upon the loss, laying-up or sale of the Ship;

(ii) if the Ship has been arrested and provided the Ship has remained under arrest for more than fourteen (14) days;

(iii) at the end of the Service Period except because of the Seafarer's misconduct.

b) The Owners/Company's obligation to repatriate ceases:

(i) If the Seafarer has been lawfully dismissed, ref Article 4;

12

(ii) If the Seafarer terminates the Employment Agreement during the Probationary Period, ref Article 4.

(iv) If the Seafarer terminates the Employment Agreement before the expiration of the service period, ref Article 4.

c) Extra costs relating to any change of address during the Service Period shall be the responsibility of the Seafarer. If the move results in any savings in repatriation costs, the Owners/Company shall realize the savings.

d) To preserve the Owners/Company's rights (in accordance with some police/immigration rules and regulations of various countries), each Seafarer shall deposit money with the Owners/Company that will be used to purchase the Seafarer's transportation to his/her gateway city in the event the Seafarer is discharged at his/her own request or for cause prior to the end of the Service Period. The amount of the deposit will depend upon the geographic location of the Seafarer's gateway city, and will be specified in notices to be posted from time to time by the Owners/Company. Seafarers on their first contract must deposit the full amount at the time they first report for duty. Returning Seafarers must deposit the full amount at the time they report for duty in connection with their current contract, or may make the deposit in installments, provided that the full amount is deposited no later than ninety (90) days after the date on which the Seafarer reported for duty in connection with the current contract. The deposit will be returned to the Seafarer at the end of the Service Period. Alternatively, the Seafarer may request that the Owners/Company use the deposit to purchase the transportation that the Seafarer will use to meet the vessel at the commencement of the Seafarer's Service Period, with any amount remaining after such a purchase being returned to the Seafarer.

Article 7 – Compassionate Leave

The Owners/Company may consider a special request of early termination of the Employment Agreement on compassionate grounds, if such termination is requested in the case of death or serious illness of spouse, children or parents.

Article 8 – Fair Treatment Polices

The Owners/Company has a Shipboard Employee Counseling and Warning Policy (an extract is attached as Annex 7) and a Statement of Fair Treatment for Shipboard Employees (an extract is attached as Annex 8). Both the Policy and the Statement are covered by the Grievance and Dispute Resolution Procedure available to Seafarers who feel they have not been treated fairly in accordance with this Agreement and the Owners/Company's policies. The complete process is described in the Owners/Company's Safety and Quality Management System

13

(SQM) and is available for all Seafarers to review at the Crew Relations Purser's desk.

b) Discrimination against or harassment of anyone by Seafarers on the basis of race, sex, nationality, religion, age, sexual orientation, color, disability, or ethnic origin will not be tolerated and may constitute cause for termination of employment.

c) In this agreement, words in the masculine gender shall include the feminine.

d) Seafarers covered by this Agreement may at any time contact the Union and ask for help in all employment related matters.

Article 9 – Fire Squads and Mobile Groups

Seafarers participating in Fire Squads/Mobile Groups, which requires them to remain onboard when the ship is in port, should as far as practicably possible be rotated so that all Seafarers participating shall not be disproportionately burdened.

Article 10 – Manning

The Ship shall be competently and adequately manned so as to ensure its safe operation.

Article 11 – Rest Period

a) Each Seafarer shall have minimum of ten (10) hours off/duty in any twenty-four (24) hours and seventy-seven (77) hours in any seven (7) day period. Hours of rest may be divided into no more than two (2) periods, one (1) of which shall be at least six (6) consecutive hours off duty; and the interval between consecutive periods of rest shall not exceed fourteen (14).

b) The Owners/Company will make its best effort to conduct Musters, fire fighting and lifeboat drills, and drills prescribed by national laws and regulations and by international instruments in a manner that minimizes the disturbance of rest periods and does not induce fatigue.

Article 12 – Teaching and Training

The Owners/Company agrees to undertake a teaching and training program so that a continuous and systematic training is conducted on board, enabling promotion to higher paid positions. The starting pay for such trainee jobs shall be at least as stipulated for the Catering Trainee position for the first ten (10) month contract. Upon re-contracting, the

14

monthly pay level shall be increased to that of the Utility position or the pay level of any other position for which the Seafarer may be rehired.

**Article 13 - Transfer of Seafarers**

The Owners/Company shall have the option at their discretion of transferring Seafarers from one ship to another ship, provided, however, that there will not be any interruption of time for calculation of leave benefits, nor increase in length of service.

**Article 14 - Cargo Handling**

a) Seafarers shall not be required or induced to carry out cargo handling duties on the port docks and other dock work traditionally or historically done by dock workers without the prior agreement of the ITF dockers' union concerned, unless ITF dockers' union workers are not available and the Owners/Company's guests cannot otherwise be accommodated and provided that the individual Seafarers volunteer to carry out such duties, for which they shall be adequately compensated.

b) Compensation for such work performed during the normal working week, as specified in Article 5, shall be by the payment of double the overtime rate for each hour or part of an hour that such work is performed, in addition to the Basic Wages. Any such work performed outside the normal working week will be compensated at triple the overtime rate for each hour or part of an hour that such work is performed in addition to the payment of the normal hourly overtime rate.

**Article 15 - Medical Attention**

a) General Rules:

(i) A Seafarer, who is discharged owing to sickness or injury, shall be entitled to reasonable and necessary medical treatment (including hospitalisation) at the Owners/Company's expense for as long as such treatment is required. The Owners/Company shall be liable for the expense of medical treatment and maintenance until the sick or injured Seafarer reaches maximum medical improvement (MMI).

(ii) If the Seafarer is covered by a national insurance scheme, expenses shall first be reimbursed by the national insurance scheme first and then by the Owners/Company, provided that this provision does not modify the Owners/Company obligation set forth in the paragraph above. This also applies in cases where the Seafarer has had the opportunity to become a member of a national insurance scheme at the time when the Seafarer entered into the Employment Agreement or later on.

15

b) Insurance Plan:

The Owners/Company has a medical insurance plan available for certain eligible positions as defined by the Owners/Company. Information regarding this plan can be obtained from the Crew Purser/HR Office.

**Article 16 - Sickness, Injury and Sick Pay**

a) During the Service Period and at the time of disembarking, the Seafarer shall be subject to medical examination when requested by the Owners/Company or its representative at the Owners/Company's expense.

(i) While serving on board or during travel to and from the vessel by the most direct route, or as directed by the Owners/Company, a sick or injured Seafarer shall be entitled to treatment at the Owners/Company's expense until the Seafarer reaches Maximum Medical Improvement.

(ii) If the Seafarer is covered by a national insurance scheme, expenses shall be reimbursed by the national insurance scheme first, then by the Owners/Company, provided that this does not modify the Owners/Company's obligation to provide treatment until the Seafarer reaches Maximum Medical Improvement.

b) Should a Seafarer become sick or injured during a voyage within the Service Period, the Owners/Company will pay the Seafarers Sick Pay at the per diem rate of the Monthly Basic Pay from such time during a voyage as the Seafarer is unable to work until such time as the Seafarer is Fit For Duty or up to a maximum of one-hundred-and-twenty (120) days, provided that satisfactory medical certificates are submitted to the Owners/Company. The days that the Seafarer is not Fit For Duty are sick days. Sick days are not counted as time worked.

c) In the event of sickness or injury necessitating signing-off for Maintenance and Cure, subject to medical approval, all payments shall be subject to the seafarer's compliance with the instructions of the Owners/Company and its Agents at the port where the seafarer is landed for medical care.

(i) With respect to Maintenance, the Owners/Company shall provide the seafarer with living accommodations during the period of treatment and convalescence, or in the discretion of the Owners/Company, provide USD twelve ($12) to twenty five ($25) per day, to defray living expenses until the sick or injured seafarer has been cured or until the sickness or incapacity has been declared to have reached Maximum Medical Improvement.

16

(ii) With respect to Cure, the Owners/Company shall be liable to defray the expenses of medical care and treatment until the sick or injured seafarer has been cured or until the sickness or incapacity has been declared to have reached Maximum Medical Improvement.

d) In the event of sickness or injury necessitating signing off, the Seafarer shall be entitled to repatriation, at the Owners/Company's expense, to the Seafarer's legal residence. The seafarer shall report his/her arrival at his/her own home or original place of engagement whichever is appropriate to the Owners/Company or its Agents as soon as possible after repatriation.

e) In the event of sickness or injury necessitating signing off, the Employment Agreement will be regarded as terminated as of the date the Seafarer signs off. However, if it is determined that the Seafarer is Fit For Duty, the Owners/Company may return the Seafarer to service without loss of service time.

## Article 17 - Paid Leave

a) Paid Leave (Vacation Pay) is earned on board during the Seafarer's Service Period. The terms "Vacation Pay" and "Paid Leave," and the receipt of Vacation Pay do not indicate permanent or continuous employment, nor do they constitute an indication that the Owners/Company will provide a future offer of employment. Vacation Pay is paid during the Service Period or paid at the end of the Service Period, as follows:

b) Marine Officers:

(i) Vacation is accrued with one (1) day vacation for each day worked for Seafarers on the 1:1 sailing system and a half (½) day vacation for each day worked for Seafarers on the 2:1 sailing system. Accrued vacation days are to be paid out when the Seafarer signs off the Ship. Accrued vacation days are not accrued while travelling to and from the ships for the purpose of signing on and off for vacation.

(ii) In exceptional circumstances, the Owners/Company may require a Seafarer to return to work earlier than scheduled or to extend a Seafarer's service prior to his/her vacation leave. This practice will be used when other reasonable alternatives are not available. The circumstances include: illness of Key Personnel on board and any matter that could affect the safe operation of the Ship or its ability to operate.

(iii) Necessary overlap in accordance with the Owners/Company SQM-policy will be during a Seafarer's vacation leave. When a Seafarer is on board for overlap as required by the Owners/Company, the Seafarer will be paid wages and accrued vacation as if he/she was on board in his regular position.

17

c) Deck and Engine Ratings and Riding Crew:

(iv) Seafarers are required to participate in Owners/Company Required Training for no more than fourteen (14) days annually during vacation leave in addition to any training required by the Owners/Company while on shipboard duty. Regular salary will be paid for the days the Seafarer is participating in such training, but vacation days will not be accrued. Travel expenses and course fees will be paid by the Owners/Company. These terms will also apply if the Owners/Company requests the Seafarer to participate in meetings at the corporate offices or perform other duties while on vacation leave.

Vacation is accrued with seven (7) days per month of service. Vacation Pay is based on the Monthly Basic Pay and it is in addition to the Monthly Total Pay. Vacation Pay shall be paid at the end of the Service Period. Parts of a month shall be prorated, with one-thirtieth (1/30) being equal to one day.

d) Hotel Personnel:

(i) General: Vacation Pay shall be three (3) days per month of service. The Vacation Pay shall be based on the Monthly Guaranteed Basic Pay. Parts of a month shall be prorated.

(ii) Groups A, B, and D: Vacation Pay is in addition to the Monthly Total Guaranteed Pay. The Vacation Pay shall be paid at the end of the Service Period.

(iii) Group C: Vacation Pay is included in the Monthly Total Guaranteed Pay.

## Article 18 - Maternity

a) The limited nature of shipboard medical facilities makes it impossible to properly address prenatal care or any potential complications or emergencies that may arise during a pregnancy while at sea. Consequently, pregnant Seafarers may not remain employed on board the vessel during the final three months of pregnancy under any circumstances. Pregnant seafarers who are interested in continuing to be employed in their positions in spite of the health risks, may do so only during the first six months of their pregnancy and only under the following circumstances:

(i) The pregnant seafarer must pay for the cost of childbirth and for any and all associated pregnancy related services and expenses required during the pregnancy;

18

(ii) The pregnant seafarer must obtain the consultation of a licensed Shoreside Obstetrician / Gynecologist (OB/GYN) at one of the ship's ports of call, at the earliest possible opportunity;

(iii) The pregnant seafarer must notify the ship's physician as soon as the seafarer becomes aware that she is pregnant and must obtain from the ship's physician the forms to be completed by the seafarer and her Shoreside OB/GYN

(iv) After taking into consideration the seafarer's medical history, shipboard life, job description, and any special circumstances, the seafarer's Shoreside OB/GYN must agree to continue to treat the seafarer and must grant the seafarer medical permission to sail for a specific period of time.

(v) The pregnant seafarer must continue to be able to perform the essential functions of her job without endangering her health and safety.

b) If, at anytime, the seafarer fails to fulfill any of the circumstances in items a) 1-5, above, then the seafarer must sign off of the vessel. Upon sign-off, the Owners/Company will provide the pregnant seafarer with an air ticket home and a compensation of USD sixty-thousand ($60,000). In addition, the Owners/Company shall pay to each child under the age of twenty-one (21) USD fifteen-thousand ($15,000), with a maximum payment for four (4) children. The names and addresses of beneficiaries shall be declared at the time of the signing of the Employment Agreement. If the Seafarer does not leave a spouse, the aforementioned sum shall be paid to the Estate of the deceased Seafarer to be administrated by the person or body authorized by law to act on the behalf of the deceased Seafarer's Estate.

### Article 19 - Loss of Life in Service

a) If a Seafarer dies whilst in the employment of the Owners/Company, including death occurring whilst travelling to and from the ship, or as a result of marine or other similar peril, the Owners/Company shall pay to the Seafarer's beneficiaries a compensation of USD sixty-thousand ($60,000). In addition, the Owners/Company shall pay to each child under the age of twenty-one (21) USD fifteen-thousand ($15,000), with a maximum payment for four (4) children. The names and addresses of beneficiaries shall be declared at the time of the signing of the Employment Agreement. If the Seafarer does not leave a spouse, the aforementioned sum shall be paid to the Estate of the deceased Seafarer to be administrated by the person or body authorized by law to act on the behalf of the deceased Seafarer's Estate.

b) If a Seafarer dies whilst in the employment of the Owners/Company, including death occurring whilst travelling to and from the ship, or as a result of marine or other similar peril or while the Seafarer is entitled to medical treatment at the Owners/Company expense, the Owners/Company or its representative, the Master, shall notify next of kin and make arrangements for burial and repatriation of the coffin. If the next of kin consent or the local authorities require, the Master

19

may order cremation in lieu of burial and arrange for the ashes to be sent home. The expenses of burial or cremation and the entombment of the ashes, in the event this is carried out by the Owners/Company or the repatriation of the coffin or ossuary urn, shall be paid by the Owners/Company;

c) The above-mentioned benefits do not apply if the death was caused by suicide.

d) Any payment affected under this clause shall be without prejudice to any claim for compensation made in law.

e) The insurance benefits under this Article include amounts payable to Filipino nationals under POEA Rules and Regulations.

### Article 20 - Disability

a) If a Seafarer suffers a disabling permanent injury as a result of an accident from any cause whatsoever whilst in the employment of the Owners/Company, regardless of the fault, including accidents occurring whilst travelling to or from the Ship and whose ability to work is reduced as a result thereof, shall in addition to his Sick Pay, be entitled to a disability compensation as percentage depending on the degree of disability of up to USD eighty-thousand ($80,000).

b) The compensation which the Owners/Company, Manager, Managing Agent and any other legal entity substantially connected with the vessel shall be jointly and severally liable to pay shall be calculated by reference to an agreed medical report, with the Owners/Company and the Seafarer both able to commission their own. When there is disagreement a third doctor shall be appointed jointly, whose findings shall be binding on all parties.

c) Any payment affected under any section of this Article shall be without prejudice to any claim for compensation made in law.

d) The insurance benefits under this Article include amounts payable to Filipino nationals under POEA Rules and Regulations.

### Article 21 - Crew's Effects

a) In the event of accident, fire or other mishap affecting the ship and whereby the Seafarer's personal effects are damaged or lost, Owners/Company shall pay up to USD three-thousand ($3,000). The Seafarer shall submit a signed statement specifying the items lost or damaged.

b) The Owners/Company shall in addition pay the Seafarer for necessary clothing needed after a shipwreck.

20

**Article 22 - Food, Accommodation, Bedding, Personal Safety Equipment and Uniforms**

a) The Owners/Company shall provide sufficient food of good quality, accommodation of adequate size and standard, bedding amenities, etc., for the use of each Seafarer whilst serving on board.

b) The accommodation standards and recreational facilities shall at least meet those criteria contained in relevant ILO Instruments, with the exception of the current dispensation given by the flag state and related to the placement of cabins.

c) The Owners/Company shall provide the necessary personal protective equipment for the use of each Seafarer whilst serving on board. In addition, the Owners/Company will supply Seafarers with appropriate personal protective equipment for the performance of hazardous job duty. Seafarers should be advised of possible hazards of any work to be carried out and instructed of any necessary precautions to be taken as well as of the use of the protective equipment. If the necessary safety equipment is not available to operate in compliance with any of the above regulations, Seafarers should not be permitted or requested to perform the work. Seafarers should use and take care of all protective equipment at their disposal and not misuse any means provided for their own protection or the protection of others. Personal protective equipment remains the property of the Owners/Company.

d) The Owners/Company shall provide uniforms with Owners/Company logos and laundering of same free of charge to the Seafarers covered by this Agreement.

**Article 23 - Service in Warlike Operations Areas**

a) During the assignment a Seafarer shall be given full information of the war zone's inclusion in the Ship's trading pattern and shall have the right not to proceed to a warlike operations area, in which event he shall be repatriated at Owners/Company's cost with benefits accrued until the date of return to the port of engagement.

b) Where a Ship enters into an area where warlike operations take place, the Seafarer shall be paid a bonus amounting to double the Basic Wage for the duration of the Ship's stay in such area subject to a minimum of five (5) days pay. Similarly the compensation for disability and death shall be doubled.

c) A warlike operations area will be as indicated by Lloyd's.

d) A Seafarer shall have the right to accept or decline the assignment without risking the termination of the Employment Contract or suffering any other detrimental effects.

21

**Article 24 - Insurance Cover**

The Owners/Company shall conclude appropriate insurance to cover themselves against the possible contingencies arising from Articles 16, 19 and 20 of this Agreement.

**Article 25 - Union Fees, Welfare Fund and Representation of Seafarers**

a) Subject to national legislation, all Seafarers shall have the right to join an appropriate national trade union affiliated to the ITF.

b) The Owners/Company shall on their own behalf pay contributions to the ITF Seafarers' International Assistance, Welfare and Protection Fund in accordance with the terms of the ITF Special Agreement, if applicable. The Owners/Company shall pay a fee to the Union on behalf of the Seafarers covered by this Agreement. The amount shall be stated in a Protocol between the Owners/Company and the Union. The Owners/Company shall, at least once every three (3) months, transfer the Fees to the Union. The Union Fees may be deducted from each individual Seafarer. The Union Fees should be remitted to the Unions through SpareBank1, P.O. Box 778 – Sentrum, N-0129 Oslo, Norway. Account Number 9001.06.16300. Benchmark Calculations. The Union Fees are part of the TCC.

c) The Owners/Company acknowledges the right of Seafarers to be members of the union and to be protected against acts of anti-union discrimination as per ILO Conventions Nos. 87 and 98.

d) The Owners/Company acknowledges the right of the Union to appoint a liaison representative from among the Seafarers who shall not be dismissed nor be subject to any disciplinary proceedings unless the Union has been given advance notice and sufficient time to ensure that adequate above based representation is provided.

e) The parties to this Agreement agree on the principle that all disputes between the Owners/Company and the Union can be and should be resolved through friendly negotiations and have therefore agreed on a Grievance Procedure.

f) The Owners/Company shall facilitate the establishment of an on board Safety Committee in accordance with the provisions contained in the ILO Code of Practice on Accident Prevention on Board Ships at Sea and in Port, and as part of their Safety Management System pursuant to the requirements of the ISM Code.

22

**Article 26 – Grievance and Dispute Resolution Procedure**

a) While on board a vessel, if the Seafarer feels that a provision of this Agreement has been violated or that he or she has been unfairly treated, the Seafarer shall have the right, either personally or through a fellow Seafarer spokesperson, to present the grievance or dispute to the ship's Human Resources Manager and if the Seafarer remains dissatisfied, to the Master. The Seafarer shall deliver to the Master written Notice of the dispute or grievance details, and no grievance or dispute will be recognized if the written Notice is not provided within thirty (30) days from the date that the grievance or dispute arose. The Master shall decide the issue.

b) If the dispute is one involving the amount of wages paid to the Seafarer, the parties hereby agree that the Owners/Company shall have the right, without incurring any further liability, within sixty (60) days of the Master receiving the written Notice from the Seafarer of a grievance, to either pay the Master receiving the amount claimed by the Seafarer or to commence an arbitration to resolve the claim and deposit the amount claimed into an interest bearing account pending a legal determination of whether the claim has merit. In the event the Owners/Company deposits the claimed amount as provided, the parties agree the sole amount to be paid to the Seafarer if the Seafarer's claim is later determined to have merit will be the amount claimed plus any accrued interest from when the dispute or grievance arose.

c) If the Seafarer is dissatisfied with the decision of the Master or if the Seafarer is not on board the vessel, then within ninety (90) days, the Seafarer shall deliver written notice of the grievance's details and of his or her dissatisfaction with the Master's decision to the representatives of the Union in Oslo, Norway and to the Owners/Company at Miami, Florida. Within thirty (30) days of receipt of the written notice of the Seafarer's dissatisfaction, the representatives of the Union and the Owners/Company shall confer to resolve the dispute.

d) If not resolved by the Union, the Owners/Company, and/or the Seafarer, all grievances and any other dispute whatsoever, whether in contract, regulatory, tort or otherwise, including constitutional, statutory, common law, admiralty, intentional tort and equitable claims, relating to or in any way connected with the seafarer's service for the Owners/Company, including but not limited to claims for personal injury or death, no matter how described, pleaded or styled, and whether asserted against the Owners/Company, Master, Employer, Ship Owner, vessel or vessel operator, shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Conventions on Recognition and Enforcement of Foreign Arbitral Awards (New York 1958), 21 U.S.T. 2517, 330 U.N.T.S. ("The Convention"), except as otherwise provided in any government mandated contract, such as the Standard POEA Contract for Philippine Seafarers. Any arbitration shall take place in the Seafarer's country of citizenship or the ship's flag state, unless arbitration is unavailable under the Convention in those

23

countries, in which case only said arbitration shall take place in Miami, Florida. Any arbitration in Miami, Florida shall be administered by the American Arbitration Association under its International Dispute Resolution Procedures. The Union shall appoint one arbitrator, the Owners/Company shall appoint one arbitrator and a third arbitrator shall be jointly appointed by the Union and the Owners/Company. However, the Owners/Company and the Union, in their discretion, may jointly select a single arbitrator. The parties shall have the right in any arbitration to conduct examinations under oath of all parties and witnesses, and medical examination necessary to verify any injuries or damages claimed. The Owners/Company, the Unions, and the Seafarer also acknowledge that they voluntarily and knowingly waive any rights they have to a jury trial. The arbitration referred to in this Article is exclusive and mandatory. Claims and lawsuits may not be brought by any Seafarer or party hereto, except to enforce arbitration or a decision of the arbitrator.

e) The Owners/Company shall each bear the costs related to the arbitration process from beginning to end including, but not limited to, fees charged and expenses incurred by arbitrators, and any costs related to proceedings brought by the Union necessary to enforce a decision. The Union and the Owners/Company shall bear the costs of their own attorney fees and legal representation. If the Seafarer rejects the representation appointed by the Union at arbitration or thereafter, then he or she will cover the cost of his or her legal representation, if any. If the Seafarer is not represented by the Union, then the arbitrator shall seek the Union's opinion as to the interpretation of this agreement before making a decision.

f) The decision of the Master shall govern until the grievance or dispute can be resolved by representatives of the Union and the Owners/Company. The Seafarer shall continue to peacefully and satisfactorily perform his or her duties and the parties shall faithfully observe this Agreement while grievances and disputes are being resolved.

**Article 27 – Construction**

The interpretation of this agreement shall be made by the consensus of the Unions and the Owners/Company. If there is a disagreement between the Unions and the Owners/Company as to interpretation, then the disagreement shall be resolved only through the arbitration procedure established in Article 26. Failing that, and in all other respects, the laws of the State of Florida, United States of America shall govern the interpretation of this Agreement. Legal action against the Owners/Company with respect to this Agreement, in relation to a Seafarer's service on board the vessel or with respect to the Employment Agreement between the Owners/Company and the Seafarers may be brought, if at all, only after exhaustion of the grievance and arbitration procedure set forth in this Agreement and only to enforce the decision of the Arbitrator.

24

**Article 28 - Amendments to and Duration of the Agreement**

This Agreement shall be effective from January 1, 2005 through December 31, 2007, and further for one year at a time if a request for termination is not given neither by the Owners/Company or the Union with three (3) months written notice. The terms and conditions of this Agreement shall be reviewed annually by the Owners/Company and Union and if at any time the Owners/Company and Union mutually agree on amendments and/or additions to this Agreement, such amendments and additions shall be agreed in writing and signed by the parties and considered incorporated in the Agreement. Furthermore, the terms and conditions of this Agreement may be amended at anytime by mutual agreement between the Owners/Company and the Union, such amendments shall be agree to in writing, signed by the parties and considered incorporated into this Agreement.

Made the first day of August 2005

By: _____ Date _____
Thomas F. Murrill
Vice President and
Chief Human Resources Officer
ROYAL CARIBBEAN CRUISES LTD.

By: _____ Date _____
Erik Bratvold
President
NORWEGIAN SEAFARERS' UNION

25

**ANNEX 1, 2, 3 AND 4**

THE WAGE SCALES ARE KEPT BY THE
CREW RELATIONS PURSER'S DESK.

A SEAFARER THAT IS GIVEN AN OFFER OF
PROMOTION TO A HIGHER POSITION, MIGHT
REQUEST TO SEE THE PART OF THE WAGES
SCALES COVERING THE OFFERED POSITION.

A SEAFARER MIGHT REQUEST TO SEE
THE PART OF THE WAGE SCALES
COVERING HIS/HER POSITION.

# ANNEX 5

## DRUG AND ALCOHOL POLICY

### Background:

Drug and alcohol abuse are significant social problems, which also could cause safety concerns for the shipping industry, resulting in accidents, damage to property, morale problems and other security risks. International and national shipping administrations have recognized these potential problems and have issued recommendations and legislation regarding control of drugs and alcohol onboard ships.

The U.S. Government has requested the shipping companies' assistance with the investigation of drug smuggling including testing of crew members and certain other control procedures such as search of the crew members' cabins and personal effects. U.S. Customs has established agreements with the shipping companies with ships that regularly call on U.S. ports to ensure that the U.S. laws are followed.

Royal Caribbean Cruises Ltd. (RCCL) supports all Flag states and other lawful authorities in their efforts to reduce drug and alcohol abuse in the shipping environment.

The safety and protection of our guests, crew, ship and environment is of vital concern to RCCL. We believe in taking every reasonable action to prevent accidents and the pollution of our sea oceans. Keeping our ships free from drug and alcohol abuse is an important part of our safe operations.

RCCL has established a comprehensive alcohol and drug policy. The objective of this policy is to provide shipboard employees with a fundamental knowledge of what RCCL expects from its employees regarding the use of drugs and alcohol.

### What is RCCL's policy?

- No crew member shall use, possess, sell or assist in the sale or distribution of illegal drugs.
- No crew member may consume or otherwise use alcohol while on duty.
- No watchkeeping employee, or any employee holding a position as described in the Safe Manning Certificate, shall consume alcohol or any other intoxicating or concentrating substance within 8 (eight) hours of the start of duty.
- No on-duty crew member shall have a blood alcohol content (BAC) above .04%. No off-duty crew member shall have a blood alcohol content (BAC) above .08%. Any crew member found to have a BAC in excess of either of these limits, while either respectively on or off duty, shall be in violation of this policy and shall be relieved from duty and subject to immediate termination.
- Employees may enjoy alcoholic beverages including beer, wine and spirits in designated employee lounges. Employees who are permitted to socialize in designated areas may also enjoy alcoholic beverages in public lounges.

RCCL recognizes alcohol dependency as a treatable condition. Our aim is voluntary disclosure, will be to guide or employees to seek professional help for rehabilitation. Individually suited measures may be considered.

### Information:

The Hiring Partner should give information regarding this policy to newly hired employees before signing on a ship. Information regarding this policy and drug and alcohol awareness training is also delivered onboard each ship.

### Testing:

Testing of an employee can be required by the company during the following circumstances:

- **Pre-Hire:**

RCCL or RCCL's Hiring Partners, may conduct the for shipboard employment to be tested for drugs and/or alcohol as a condition of their employment. Candidates refusing a test or who test positive will not be employed.

- **Random Testing**

The company may require random drug testing of all employees. Such testing will be carried out by compliance with internationally accepted procedures regarding collection and testing procedures, integrity and identity of specimens, laboratory requirements, chain of custody and review of results.

- **At any time of an accident or near accident**

In case of an accident, or near accident, the company at a regulatory enforcement official may require each crew member who was directly involved in the accident or near accident to be tested for evidence of drugs or alcohol.

- **At any other time the Master has reasonable cause to require testing**

The Master may, whenever there is a reasonable cause, require any shipboard employee to be tested for evidence of drugs or alcohol. When a member of the management team feels there is reasonable cause to suspect the random testing of any employee, a request along with any applicable supporting evidence must be made to the ship's Master. The Master, at his own choosing, will then either approve or deny the request for the testing based on the provided evidence.

The Master may also, at his discretion, delegate authority for ordering an alcohol screening to another member of the senior management team (Staff Captain, Hotel Director, Chief Engineer). When delegating this authority to another member of the senior management team, it is the master's responsibility to ensure that the designated senior management team member is fully versed in the company's alcohol policy and testing procedures.

Individuals who refuse to submit to a test when required to do so, will be removed from duty and may be immediately terminated.

Testing procedures onboard:

Random testing shipboard will be at the discretion of Human Resources. All other testing onboard requires the approval of the Master.

Testing onboard will be done by one of the ship's Doctor or Nurses, or by an acknowledged testing organization or laboratory. Testing will be witnessed by the Staff Captain, Security Officer, or Safety Officer.

The employee is entitled to select a witness among the other crew members to accompany him/her during a test procedure onboard. The witness must be onboard and readily available at the time of the testing. The testing for alcohol abuse onboard will normally be done by use of the ALCO meter 02 sailing system, but other means may be used.

Testing for potential drug abuse will normally be done by urine test, but may be done by a blood test. Employees are required to provide blood specimens when directed to do so by the company or a regulatory enforcement official.

All testing and medical records must be kept strictly confidential.

### Management's Responsibility

It is the policy of RCCL that all managers are responsible for the enforcement of and compliance with the company's drug and alcohol policy. Every RCCL manager has an affirmative obligation to address any known or suspected violation of the company's drug and alcohol policy. Managers who knowingly choose not to address violations or potential violations of the company's drug and alcohol policy will be subject to disciplinary action up to and including termination of employment.

### Policy Violations

Any employee who violates this policy may be subject to disciplinary action up to and including immediate termination of employment.

## ANNEX 6
## Policies Prohibiting Harassment, Inappropriate Casual Interaction and Crime

### Policy Prohibiting Harassment

The Company is committed to making our workplaces under for employees and guests. A 'safe' workplace is one that is free of intimidation and harassment. The purpose of this policy is as clearly explains

- What we mean by harassment,
- What harassment looks like, and
- What could happen if you are accused of harassment?

### Definition: Harassment

Harassment, as defined for this policy, means verbal or physical conduct that demeans or shows hostility or prejudice toward an individual because of his/her gender, sexual preference, race, religion, color, national origin, ethnicity, age or disability, or that of his/her relatives, friends or associates.

- Harassment creates an intimidating, hostile or offensive work environment,
- It can make it difficult for a person to perform their normal work duties.
- It lowers morale and makes victims of harassment feel held back from other job opportunities.

Receiving appropriate job performance feedback, counseling or direction from your supervisor is not considered harassment. If you object to the manner in which the feedback is provided, you may request a review with the department head.

### What is Sexual Harassment?

"Sexual" harassment is a type of harassment. It means unwelcome sexual advances, requests for sexual favors or other verbal, written or physical conduct of a sexual nature when it is made explicitly or implicitly a term or condition of employment, is used as a basis for employment decisions, or unreasonably interferes with an individual's work performance or creates an offensive work environment.

- Sexual harassment does not refer to occasional compliments of a socially acceptable nature.
- It refers to behavior that is not welcome, that is personally offensive, that fails to respect the rights of others, that lowers morale and that interferes with work effectiveness.

The following behaviors are examples of sexual harassment and will not be tolerated:

- Derogatory, degrading and/or offensive comments about someone's gender or sexual orientation. This includes inappropriate jokes, stories or telling of experiences.
- Bringing physical objects or materials of a sexual nature into the workplace. This includes photographs, posters, calendars, or other graphic materials.
- Using indecent language in the presence of co-workers.
- Touching co-workers in ways that may be considered 'sexual' or 'inappropriate'.

- Pursuing an intimate relationship with a co-worker who does not reciprocate that interest. You should accept his/her decision and maintain a respectful working relationship.

If you feel you are being harassed, you should immediately tell the person harassing you the behavior is unwelcome and must stop. If the harassment does not stop, follow the guidelines below for reporting harassment.

## Reporting Harassment

Here are the appropriate steps to take for reporting harassment:

- All employees report incidents to their department heads.
- Shipboard department heads report to the Staff Captain.
- Shoreside department heads report to the Vice President of Human Resources.

If a complaint involves the employee's department head (or if the employee has reported an alleged violation to the department head and employee does not believe that the department head has taken appropriate action, then the employee should act as follows:

- Shipboard employees should report the alleged act to the Staff Captain.
- Shoreside employees should report the matter to the Vice President, Human Resources.

### What Happens When A Complaint Is Filed?

All inquiries or complaints will be investigated promptly, thoroughly, and as confidentially as possible for the protection of both the employee and the accused.

- If an investigation confirms that harassment has occurred, the Company will take appropriate corrective action.
- If the harassment involves someone who is not an employee, the Company will take appropriate action within its control.

You will never be punished for reporting harassment, as long as your report is honest. Any manager or supervisor who is made aware of sexual harassment and fails to take corrective action according to this policy will be subject to discipline. Any manager or supervisor who retaliates against an employee for reporting a chain of harassment will be dismissed.

## Policy Prohibiting Inappropriate Guest Interaction

### Sexual Contact or Intimacy with Guests is Not Permitted

Our professional relationship with our guests makes it absolutely necessary that we conduct ourselves appropriately at all times. Sexual contact or intimacy with guests is never acceptable. This includes the following behaviors:

- Having any sexual contact with guests even if guests agree it is not appropriate.
- Offering sexual favors of any kind to guests is not appropriate.
- Accepting guests' sexual advances is not appropriate.

All of these behaviors violate Company policy. If you have sexual contact with a guest you can be dismissed immediately. This policy applies to all employees when onboard Company vessels or ground properties owned or leased by the Company.

2

---

Having sexual relations with minors, sexual assault and rape are all serious, punishable by law. All allegations of sexual contact with minors and sexual assault and rape will be investigated and reported by the Company to the proper legal authorities and will be prosecuted to the fullest extent allowed by the law. This is further explained below in the Zero Tolerance Policy on Crime.

### Avoid Problem Situations

The following guidelines are for the protection of you and our guests. There guidelines will be strictly enforced. Following them at all times will keep you safe from charges of misconduct from guests:

- Never allow guests into employee quarters, other than for a legitimate business purpose.
- Never allow guests to attend employee parties.
- Never enter a guest stateroom without proper authorization. There are no exceptions. Any employee found in a guest stateroom who is not fulfilling a guest accommodation (i.e. stateroom service, maintenance, or maintenance personnel) shall be dismissed immediately.
- Never use guest elevators unless in the line of duty.

### Safe Practices

- Always treat guests with respect and courtesy. However, if a guest becomes violent or sexually aggressive towards you, leave the scene and tell a member of the security staff, your supervisor or department head immediately.
- Always politely refuse to contact sexuality if a guest requests an escort back to his/her stateroom.
- Always tell the Bridge Officer if any guest is humiliated and incapacitated. The Security Officer or any member of the security staff will be called to assist.
- Always avoid touching guests in ways that may be considered 'saucy' or 'inappropriate'.

### Management Accountability

If an employee violates the policies, the employee's supervisor, manager and department head will be required to provide the Captain with information regarding what actions they took to prevent the violation, e.g. employee counseling, crew education, etc.

## Zero Tolerance Policy on Crime

Criminal conduct by employees or guests is not permitted. If you witness any crime, tell a member of the Security staff immediately.

The Company in cooperation with our Industry associates, the International Council of Cruise Lines, has established a Zero Tolerance Policy on Reporting Crime. The policy established guidelines for reporting allegations of serious crimes committed onboard our ships to appropriate law enforcement authorities. A serious crime is generally defined as a felony, which would include sexual contact with minors, or sexual rape or battery.

The reporting process is as follows:

- Serious crimes committed on the high seas against or by a U.S. citizen will be reported to the U.S. Federal Bureau of Investigation, (F.B.I.).
- Serious crimes committed on the high seas against a non-U.S. citizen will be reported to the appropriate authorities of the vessel's next port of call.

3

**ANNEX 7**

**Extract from the Procedures for Employee Counseling and Warning**

**Verbal Counseling**

Verbal Counseling is to be given when offenses occur for the first time. It is originated by the employee's supervisor and shall be documented on the Employee Counseling Form. A Verbal Counseling shall be entered into the Encore System and are valid for 12 months from the date of issue.

**Written Warning**

If the employee's behavior/performance problem continues, the Supervisor and Department Head will meet with the employee to issue a Written Warning. The Written Warning can only be issued by the Department Head and is not valid without the signature of the Department Head. Three warnings should be brought to the attention of the Staff Captain. The Staff Captain may issue a Written Warning to all employees for discipline issues. The Written Warning shall be entered into the Encore System and are valid for 12 months from the date of issue.

Three written warnings within a 12-month period require a mandatory Masters Hearing.

Below are some examples on circumstances when a written warning might be issued. The Department Head shall evaluate and take into consideration the circumstances regarding the violation on a case-by-case basis.

- Misconduct.
- Losing Crew Card.
- Unauthorized use of guest areas.
- Returning onboard within 30 minutes of sailing.
- Smoking in unauthorized area.
- Failure to comply with safety rules and wearing safety equipment.
- Failure to attend safety drills or training.
- Cabin not kept clean.
- Failure to report injury or accident to self or others.
- Inability to cooperate with fellow crew members.
- Late arrival for duty.
- Late on payday.
- Leaving work early without permission.
- Threatening fellow crew members or abusive language.
- Failure to adhere to uniform dress code.
- Failure to comply with Customs, Immigration or Agricultural laws.
- Failure to report to Purser when signing on.
- Deliberate misuse or damage of Company's property including graffiti.
- Insubordination and refusal to follow supervisor's lawful orders.

---

- Serious crimes committed while the vessel is in another sovereign state's territorial waters will be reported to the appropriate authorities. If the vessel is making a port visit in that country. If the crime was committed by or against a U.S. citizen the crime will also be reported to the local U.S. Consulate and the F.B.I. in the U.S.

- Serious crimes committed on the high seas against or by a U.S. citizen when the vessel is not returning to the U.S. during that voyage, will be reported to the local U.S. Consulate (next port of call) and the F.B.I. in the U.S.

At any time a victim requests further action after the incident has been reported, they should be given the phone number and/or address of the law enforcement agency for an explanation as to the disposition of their case.

The Risk Management Department will handle the process of notifying the law enforcement authorities.

**ANNEX 8**

**Statement of Fair/Fraternal for Shipboard Employees**

Royal Caribbean Cruises Ltd. and Royal Caribbean International recognize that crewmembers have the basic right to be respected and treated in a fair and just manner at all times by superiors and fellow crew members. Onboard the ship, we must function as a team in order to deliver excellent service through our efforts. By accepting this fact, it is important that we communicate with one another to solve misunderstandings or correct mistakes when they occur. Examples might be that you have a concern with a co-worker, or that you have not been paid correctly.

We understand that the effort to solve concerns sometimes becomes more challenging, because of the diversity of values and beliefs onboard, but we encourage you to embrace our policy of fair treatment and our system of complaint resolution on the ships. This system is outlined in several simple steps.

1: If you have a suggestion, problem or complaint, sit down with your supervisor and discuss the situation calmly. Organize your thoughts and listen carefully to the supervisor. This is the first opportunity to work together as a team.

2: If you are unable to solve the suggestion, problem or complaint with the supervisor, make an appointment with your Division Head. He or she will listen to you. Remember to be open and honest and to stay with the facts. Changing your story will not help the situation. Good communication and an open mind by everyone should enable the situation to be resolved.

3: If you have reached this step, then obviously the situation needs assistance by someone who has proven problem-solving skills. This person is your Department Head, (Staff Captain – Deck); (Chief Engineer – Engine); (Hotel Director – Hotel); this person has the shipboard experience and knowledge to handle human relations concerns. Make an appointment with your Department Head to discuss your concerns. He or she will listen and render a decision based on all the facts. If you are not satisfied with the decision, or this approach, you may present the dispute to the ship's Human Resource Manager as a formal Grievance that can be appealed to the Master of the ship.

---

- Unauthorized operation of ship's equipment/machinery.
- Solicitation of tips or excellent redeye.

**Termination of Employment**

The Master can decide to dismiss an employee for a serious violation of company policies and / or when the employee does not show enough improvement after due counseling / warnings procedure has taken place. The Master is then responsible to make sure that applicable Flag State legislation and procedures in the applicable Collective Bargaining Agreement are followed in the termination procedure.

In special circumstances, corporate management may issue written warnings and take disciplinary action up to termination of shipboard employees.

Below are examples of violations that may be considered serious enough for immediate dismissal, however there may also be other instances leading to dismissal based on the Master's evaluation of the actual circumstances:

- Violence against another person guests or crew.
- Smuggling, cooperating or failure to report narcotics traffic.
- Dishonesty.
- Falsification of company records.
- Going to guest cabin or taking guest to crew area.
- Misconduct towards guest.
- Possession of illegal weapon.
- Sexual Harassment.
- Theft of guest, crew or company property.
- Violation of company drug and alcohol policy.
- Use of other crew member's crew card.
- Sexual assault.
- Arrested ashore for criminal offense.
- Unauthorized release/use of ship's records.
- Contravention of the Save the Waves Program.
- Missing the ship.
- Jumping ship.
- Possession of unauthorized electrical appliances, candles and tampering with smoke detectors.

2



**USEFUL ADDRESSES:**

Royal Caribbean International
1050 Caribbean Way,
Miami, FL 33132, U.S.A.
PH: +1-305-539-6100
FX: +1-305-539-6168

Norwegian Seafarers' Union
Head Office
Post Box 2000 Vika
N-0125 Oslo, Norway
PH: +47-22 82 58 00
FX: +47-22 33 66 18
EM: firmapost@sjomannsforbundet.no
Visiting: Maritime Hus
Rosenkrantz gate 15-17
Oslo, Norway

Norwegian Seafarers' Union
Miami Service Office
1001 North America Way, Room 101
Miami, FL 33132, USA
PH: +1-305-371-3120
FX: +1-305-371-3211
E-mail: nsumiami@nsu.org

FIt-Nor GAIN
Philippine Service Office
G/F ECJ Building, Real corner
Arzobispo St., Intramuros
Manila, Philippines
PH: +63-(0)2-405-0210
FX: +63-(0)2-405-0220
EM: ftnor@info.com.ph